Filed 3/22/21 In re J.O. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE J.O., a Person Coming Under the Juvenile Court Law. | H047638, H047647 (Santa Cruz County Super. Ct. No. 17JU00305A) |
| THE PEOPLE, Plaintiff and Respondent, v. J.O., Defendant and Appellant. | |

J.O. appeals from the juvenile court's disposition order committing him to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) and the juvenile court's denial of his Welfare and Institutions Code section 778[1] petition to change the disposition order. J.O. argues that the juvenile court abused its discretion by ordering him committed to the DJJ because there was no specific evidence in the record of the programs at the DJJ that would benefit him, the juvenile court erroneously denied his section 778 petition after wrongly concluding that he failed to present new evidence or a change of circumstance, and the juvenile court erred when it

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

imposed probation conditions because the court lost its power to supervise him after it committed him to the DJJ. We agree with J.O. that the probation conditions must be stricken and reject his other claims of error. We also modify the minute order of the disposition hearing to correctly reflect that the two victim restitution orders are not imposed as probation conditions. We affirm the modified disposition order and the juvenile court's order denying J.O.'s section 778 petition.

## I.    BACKGROUND

On June 5, 2018, a juvenile wardship petition (§ 602) was filed alleging that J.O. (born 2002) committed attempted murder (Pen. Code, §§ 664, 187, subd. (a); count 1), three counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); counts 2-4), robbery (Pen. Code, § 211; count 5), and burglary of an inhabited dwelling (Pen. Code, § 459; count 6). As to the count of attempted murder, it was alleged that J.O. personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)) and personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). As to two of the counts of assault with a deadly weapon (counts 2 & 3), it was alleged that J.O. personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)).

On March 29, 2019, J.O. admitted the count of attempted murder (Pen. Code, §§ 664, 187, subd. (a); count 1) with the allegations that he personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)) and personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); counts 3 & 4), and the count of robbery (Pen. Code, § 211; count 5). The juvenile court dismissed one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a); count 2). The juvenile court dismissed the count of burglary (Pen. Code, § 459; count 6) but stated that it would be considered at disposition. The parties stipulated to the following as the factual basis for J.O.'s plea: "[O]n or about May 28, 2018, [J.O.] and other minors conspired and entered the home of John Doe with the intent to commit theft and use force or fear to take items from John Doe. In the

2

course of that, they struck John Doe with a hammer causing serious injury to John Doe. They also used deadly weapons and caused injury to John Doe 2 and John Doe 3."

On May 8, 2019, J.O.'s counsel filed a psychological evaluation that concluded that J.O. "would be amenable to treatment and interventions which would reduce the risk of future antisocial behavior." (Underscore omitted.) The psychological evaluation stated that J.O. frequently used marijuana, and "[i]t does appear likely he was significantly under the influence of THC at the time of the offense." The evaluation also noted that J.O. "failed to benefit from past psychotherapy when under probation supervision, but [he] report[ed] a positive attitude toward the therapy he [was] receiving in Juvenile Hall."

The following week, the probation department filed a disposition report recommending that J.O. be committed to the DJJ. According to the report, in 2017, J.O. had been granted deferred entry of judgment and had been placed on probation after committing a burglary (Pen. Code, § 459). The report disclosed that J.O. had been making progress toward successful completion of his probation, but he committed his current offenses "and is believed to have crushed the skull of at least one individual as that person slept," causing "lifelong and traumatic physical injury to his victim(s)" and "substantial emotional damage to all who were directly and indirectly involved," including J.O. himself. The report acknowledged that J.O. stated that he had been using marijuana on a daily basis before he committed his offenses. The report concluded that the assigned probation officer had considered the programming and services offered by the probation department and had consulted with probation management, but ultimately, the probation officer did "not believe services other than those available at the Division of Juvenile Justice are appropriate."

On June 26, 2019, the probation department provided an update to the juvenile court. Since J.O.'s last juvenile court appearance, juvenile hall staff had generated a total of 19 incident reports involving J.O. The incident reports described occurrences where

3

J.O. declined to participate in programs, declined to attend school, and assaulted other youths.

On July 8, 2019, the juvenile court held a disposition hearing on J.O.'s current wardship petition and the 2017 burglary. The juvenile court stated that it had taken into consideration J.O.'s age, the circumstances and the gravity of his offenses, and his prior history of delinquency. The juvenile court also stated that it had considered whether substantial evidence demonstrated that a DJJ commitment provided probable benefit to J.O. The juvenile court noted that J.O. had been in juvenile hall for 403 days pending his disposition hearing, and over the course of that period, J.O. had initially participated in programs and had made efforts toward his rehabilitation. However, as time progressed, J.O.'s behavior began to deteriorate, and there were instances where he declined to participate in programs, declined to attend school, and went back to "some gang association [and] assaultive behavior." The juvenile court determined that J.O.'s behaviors "certainly justify a higher level of need for rehabilitation over what is available in our juvenile hall."

Thereafter, the juvenile court concluded that "this is a case of severe impact and definitely warrants . . . a DJJ commitment." The juvenile court determined that "there is demonstrated not only probable benefit but certain benefit for [J.O.] to be able to receive the rehabilitative efforts of the [DJJ]." The juvenile court stated that placement with the DJJ "is one where there is mental health professionals" that could assist J.O. The juvenile also court stated that "[p]art of the treatment of DJJ will be to address [J.O.'s] substance abuse." The juvenile court committed J.O. to the DJJ for a maximum confinement time of 17 years and four months. The juvenile court then imposed various terms of probation and ordered victim restitution.

Following the disposition hearing, the juvenile court held several section 737 review hearings while J.O. remained detained in juvenile hall pending his commitment to

4

the DJJ. During that time, the probation department reported that J.O. was involved in an additional 67 incident reports at juvenile hall.

On August 23, 2019, J.O.'s counsel filed a section 778 petition to change the juvenile court's disposition order. The petition asked the juvenile court to rescind its order committing J.O. to the DJJ and to consider alternative dispositions. According to the petition, Santa Cruz County Probation Department Chief of Probation Fernando Giraldo had signed a declaration pertaining to A.M., one of the co-participants in J.O.'s case. Chief Giraldo's declaration stated: "DJJ will be a harmful placement for [A.M.]. DJJ is a prison-like environment that is physically dangerous, the culture is riddled with violence and gang hostility. DJJ serves the most dangerous and violent youth within our communities, which [A.M.] is not. If [A.M.] is sent to DJJ[,] I believe he will be in physical danger, mentally suffer, and experience significant trauma." Citing Chief Giraldo's declaration, J.O.'s counsel argued that committing J.O. to the DJJ would traumatize him, subject him to physical violence, and offer no rehabilitation. J.O.'s counsel also attached a report prepared by the Center on Juvenile and Criminal Justice dated February 2019 that described the DJJ as "violent" and "isolated."

On September 24, 2019, the juvenile court directed J.O.'s counsel to file a redacted section 778 petition that protected co-participant A.M.'s privacy. The redacted request was filed on October 3, 2019.

On October 11, 2019, the probation department submitted materials describing the DJJ and its programs. The materials included documents taken from the DJJ website describing the programs available at the DJJ, including mental health treatment programs, various intervention strategies, and educational and career programs. All of the documents stated that they were accurate as of June 2019 but that a "new update" would be "published in September 2019 at which time [the] update will expire." (Italics omitted.)

5

The probation department also submitted materials and news articles describing proposed reforms to the DJJ. According to a Senate Rules Committee report, one proposal was to move the DJJ from the Department of Corrections and Rehabilitation to a new department under the California Health and Human Services Agency and rename the DJJ to the "Department of Youth and Community Restoration."

On October 25, 2019, the juvenile court sent a memo to the probation department requesting "immediate supplemental Dispositional information regarding [J.O.'s] commitment to DJJ." The juvenile court stated that it had carefully reviewed recent case law while handling a co-participant's case, and it believed that J.O.'s disposition report and the juvenile court's findings at disposition "did not rise to the level of detail and specificity under recent appellate cases entitled *In re Carlos J.* (2018) 22 Cal.App.5[th] 1, or *In re A.M.* [(2019)] 38 Cal.App.5[th] 440" because "[t]hese cases outline the requirement for probation and the court to specify what therapeutic programs the minor will probably benefit from at DJJ." The juvenile court then stated: "Since DJJ has reviewed the case and accepted this youth, they have no doubt determined what programs fit his needs that he would benefit from and what those programs entail." The juvenile court asked the probation department to submit the supplemental materials as soon as possible, or, at the least, before the date of J.O.'s next section 737 review hearing. The record, however, does not reflect that the probation department provided any supplemental materials.

On November 1, 2019, J.O.'s counsel filed supplemental points and authorities to his section 778 petition. Citing *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*), counsel argued that the disposition report lacked facts about specific programs available at the DJJ and how they might benefit J.O. Thus, counsel argued that the juvenile court was required to hold a new disposition hearing.

On November 13, 2019, the juvenile court held a hearing on J.O.'s section 778 petition. The juvenile court characterized J.O.'s petition as having two parts: the

section 778 petition to change his commitment to the DJJ based on the declaration prepared by Chief Giraldo, and his subsequent request to reopen disposition to comply with *Carlos J.*, *supra*, 22 Cal.App.5th 1. After considering the parties' arguments, the juvenile court denied the section 778 petition. The juvenile court, however, also noted that it appeared that the DJJ would be undergoing many reforms in the near future.

On November 27, 2019, the juvenile court issued a written ruling denying J.O.'s section 778 request to change his commitment to the DJJ. The juvenile court determined that there had been no new evidence or change of circumstance that would warrant a modification of its order committing J.O. to the DJJ, and Chief Giraldo's declaration was not new evidence and was limited to his assessment of co-participant A.M. The juvenile court further concluded that J.O.'s claim that a new disposition hearing was warranted under *Carlos J.*, *supra*, 22 Cal.App.5th 1, was more properly raised in an appeal. The juvenile court also noted that *Carlos J.* "was published out of another appellate district other than the [Sixth Appellate District]" and was "therefore no[t] binding on this court."

The juvenile court attached a supplemental declaration prepared by Chief Giraldo to its ruling. In his supplemental declaration, Chief Giraldo stated that his previous declaration was limited to his opinions about co-participant A.M., and, at his direction, the probation department continues to use the DJJ as a placement depending on the circumstances of each case and the needs of the individual juvenile.

J.O. timely appealed from the juvenile court's denial of his section 778 petition (case No. H047638). This court granted J.O.'s application for relief from default on January 19, 2020, and an amended notice of appeal was filed from the July 8, 2019 disposition order (case No. H047647).[2]

---

[2] On our own motion, we ordered case Nos. H047638 and H047647 considered together for the purposes of briefing, oral argument, and disposition.

## II. DISCUSSION

### A. *The Disposition Order*

J.O. argues that the juvenile court abused its discretion by committing him to the DJJ because there was insufficient evidence that the commitment would provide him probable benefit. Primarily relying on *Carlos J.*, *supra*, 22 Cal.App.5th 1, J.O. claims that the record lacks information about specific programs available at the DJJ that can address his specific needs.[3]

#### 1. *Governing Principles and Standard of Review*

When a minor is adjudged a ward of the juvenile court, "the court may make any reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor." (§ 727, subd. (a)(1).) In determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) The court may also consider public safety. (§ 202, subd. (b).) The court has a wide range of options available for placing its wards, including probation, placement in a relative's home, foster home, licensed community care facility, or group home (see § 727, subd. (a)(4)); commitment to "a juvenile home, ranch, camp, or forestry camp" or "the county juvenile hall" (§ 730, subd. (a)); or commitment to the DJJ (§ 731, subds. (a)(4), (c); see *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306 (*Lara*)).

In order to commit a minor to the DJJ, the juvenile "court [must be] fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other

---

[3] The People argue that since J.O. did not rely on *Carlos J.* during the disposition hearing, he has forfeited his challenge on appeal. We do not reach the People's forfeiture argument. Assuming J.O.'s challenge has been preserved, we find no merit in his contentions for the reasons explained below.

treatment provided by the [DJJ]." (§ 734; see also *In re Eddie M.* (2003) 31 Cal.4th 480, 488 ["court must find that [the DJJ] would likely benefit the ward"] (*Eddie M.*).)  In addition, "the record must show that less restrictive alternatives would be ineffective or inappropriate. [Citation.]"  (*Lara, supra*, 4 Cal.5th at p. 306.)  However, "[n]othing bars [the DJJ] for . . . wards who have received no other placement. [Citations.]"  (*Eddie M., supra*, at p. 488.)

We review a juvenile court's decision to commit a minor to the DJJ for abuse of discretion.  (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395 (*Michael D.*).)  "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.]" (*Ibid.*)  A reviewing court must examine the evidence at the disposition hearing in light of the purposes of the juvenile court law. (*Ibid.*) Those purposes include (1) the protection and safety of the public, and (2) rehabilitation of the minor through care, treatment and guidance which is consistent with the minor's best interest, holds the minor accountable for his or her behavior, and is appropriate for the circumstances. (§ 202, subds. (a), (b) & (d).)  The court may also consider punishment that is consistent with rehabilitative purposes and a restrictive commitment as a means of protecting public safety. (See *id.*, subd. (b); *Michael D., supra*, at p. 1396; *In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1564.)

### 2.    *Substantial Evidence Supports the Juvenile Court's Decision*

J.O. argues that there is no specific evidence in the record that a DJJ commitment will provide him probable benefit.  He argues that the record lacks evidence of specific DJJ programs that could address his needs.

J.O. relies primarily on *Carlos J., supra*, 22 Cal.App.5th 1.  In *Carlos J.*, the 15-year-old minor "did not have a substantial record of involvement with the juvenile court system." (*Id.* at p. 4, fn. omitted.)  The probation department recommended that the

9

minor be committed to the DJJ[4] after concluding that the minor was a public safety risk and could receive gang intervention services at the DJJ. (*Id.* at pp. 8-9.) No witnesses testified at the disposition hearing, and no information was provided about specific services provided by the DJJ. (*Id.* at pp. 9, 14.) The juvenile court followed the probation department's recommendation and committed the minor to the DJJ, and the First Appellate District reversed, concluding that the juvenile court's decision was not supported by substantial evidence. (*Id.* at pp. 10-15.) The *Carlos J.* court held that "[i]n order for a juvenile court to make the determination of probable benefit . . . there must be *some* specific evidence in the record of the programs at the [DJJ] expected to benefit a minor." (*Id.* at p. 10.) *Carlos J.* also concluded that "[w]here a minor has particular needs, the probation department should also include *brief* descriptions of the relevant programs to address those needs." (*Id.* at p. 12.)

J.O. argues that *Carlos J.* is instructive. J.O. further argues that the record reflects that he has specific mental health needs, but the record lacks information about how a DJJ commitment could address those needs. For example, the juvenile court noted that a DJJ placement "is one where there [are] mental health professionals" that could assist J.O. and that "[p]art of the treatment of DJJ will be to address [his] substance abuse." However, at the time the disposition hearing was held, there was no information in the record about the specific treatment programs available at the DJJ.[5]

We find *Carlos J.* distinguishable. Shortly after *Carlos J.* was decided, the Fourth Appellate District issued its opinion in *In re A.R.* (2018) 24 Cal.App.5th 1076 (*A.R.*). In

---

[4] The DJJ is also known as the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF). (*In re N.C.* (2019) 39 Cal.App.5th 81, 85, fn. 3.) DJJ and DJF are used interchangeably in case law. (*Ibid.*)

[5] As we have discussed, the probation department later submitted materials about some of the programs offered at the DJJ after the juvenile court committed J.O. to DJJ. These materials were not available to the juvenile court at the time of the disposition hearing.

*A.R.*, the juvenile court committed the minor to the DJJ. (*Id*. at p. 1078.) Relying in part on *Carlos J.*, *supra*, 22 Cal.App.5th 1, the minor in *A.R.* argued that his DJJ commitment was not supported by substantial evidence because the record lacked information about the probable benefit from a DJJ commitment, including specific programs that would be available to him. (*A.R.*, *supra*, at p. 1081.) The Fourth Appellate District distinguished *Carlos J.*, noting that unlike the *Carlos J.* minor, the minor in *A.R.* "had a long history with the juvenile system and the juvenile court had already tried various less restrictive placements." (*A.R.*, *supra*, at p. 1081.) Thus, *A.R.* held that the juvenile court properly focused on " 'criminogenic factors, the history presented, [and] the need for drastic measures,' along with the 'well of services available,' in concluding DJJ would meet [the minor's] rehabilitative goals." (*Ibid*.) Accordingly, there was substantial evidence of probable benefit to the minor from a DJJ placement. (*Ibid.*)

We find that this case is analogous to *A.R.* Like the minor in *A.R.*, J.O. had a history of juvenile delinquency. J.O. was on probation at the time that he committed the offenses that led to the current petition. While awaiting disposition, J.O. was placed in juvenile hall for a period of 403 days. Before the disposition hearing, the probation department reported that juvenile hall had generated a total of 19 incident reports involving J.O., and he was involved in incidents that ranged in seriousness from declining to participate in programs and school to assaults on other youths. During the disposition hearing, the juvenile court expressly stated that it had considered J.O.'s prior history of delinquency and noted that J.O.'s behavior in juvenile hall had deteriorated while he awaited disposition in the current case.

"A juvenile court must determine if the record supports a finding that it is *probable* the minor will benefit from being committed to DJJ." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.) "There is no requirement that the court find exactly how a minor will benefit from being committed to DJJ." (*Ibid.*) One benefit from a DJJ

11

commitment is the secure environment. "In other words, it is not merely the programs at DJJ which [would] provide a benefit to [a] minor, but the secure setting as well." (*Ibid.*)

In this case, the juvenile court found that "there is demonstrated not only probable benefit but certain benefit for [J.O.] to be able to receive the rehabilitative efforts of the [DJJ]." While it did not specifically cite to evidence of particular DJJ programs that could benefit J.O., the juvenile court stated that placement with the DJJ "is one where there is mental health professionals" that could assist J.O. and that "[p]art of the treatment of DJJ will be to address [J.O.'s] substance abuse." The juvenile court recognized that J.O. had initially participated well in programs in juvenile hall, but as time progressed, his conduct worsened, and he went back to "some gang association [and] assaultive behavior." J.O. had also been unsuccessful on probation after he was granted deferred entry of judgment in 2017. The juvenile court stated that J.O.'s behaviors "certainly justify a higher level of need for rehabilitation over what is available in our juvenile hall." It was reasonable for the trial court to conclude that the structure and the secure setting provided by the DJJ would be beneficial to him. J.O. "had a long history with the juvenile system and the juvenile court had already tried various less restrictive placements"; thus, "[t]he court properly focused on 'criminogenic factors, the history presented, [and] the need for drastic measures,' along with the 'well of services available'" when it found evidence of probable benefit. (*A.R.*, *supra*, 24 Cal.App.5th at p. 1081.)

Based on the record, substantial evidence supports the juvenile court's determination that it was probable that J.O. would benefit "by the reformatory educational discipline or other treatment provided by the [DJJ]." (§ 734.) Since substantial evidence supports the juvenile court's decision, no abuse of discretion occurred.

## B.  The Section 778 Petition

Next, J.O. argues that the juvenile court abused its discretion when it denied his section 778 petition to change the disposition order.  He argues that the juvenile court failed to recognize that Chief Giraldo's declaration was new evidence, and it failed to follow binding precedent, *Carlos J.*, *supra*, 22 Cal.App.5th 1.

### 1.  *Governing Principles and Standard of Review*

Section 778 authorizes a "person having an interest in a child who is a ward of the juvenile court" to, "upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of [the] court previously made."  (*Id.*, subd. (a)(1).)  "If it appears that the best interests of the child may be promoted by the proposed change of order," the court must hold a hearing to determine whether the petition should be granted.  (*Id.*, subd. (a)(2).)

If the section 778 petition states a change of circumstance or new evidence *and* it appears that the best interest of the child may be promoted by the proposed change of order, the court may grant the petition.  (Cal. Rules of Court, rule 5.570(e)(1).)[6]  The party requesting the modification has the burden of "proving by a preponderance of the evidence that the ward's welfare requires the modification."  (Rule 5.570(i)(1).)  "[M]odification or termination [of the prior order] rests in the sound discretion of the trial court and, in the absence of a clear showing of abuse of discretion, an appellate court is not free to interfere with the trial court's order."  (*In re Corey* (1964) 230 Cal.App.2d 813, 831-832.)

### 2.  *No Abuse of Discretion in Denying the Section 778 Petition*

First, the trial court did not abuse its discretion when it concluded that there was no new evidence or change of circumstance that warranted changing J.O.'s commitment to the DJJ.

---

[6] All further rule references are to the California Rules of Court.

13

The new evidence relied upon by J.O. was Chief Giraldo's declaration, which expressed his opinion about the effect of DJJ on a *co-participant*, A.M., not J.O.[7] J.O. claims that Chief Giraldo's declaration was prepared *after* the disposition hearing and constituted new evidence. Section 778 does not define "new evidence," but identical language is found in section 388, and appellate courts have defined "new evidence" within the context of section 388 as "material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered." (*In re H.S.* (2010) 188 Cal.App.4th 103, 105; see rule 5.570 [applying same rules for requests to change court orders under sections 388 and 778].)

Assuming that Chief Giraldo's declaration was new evidence under section 778, the juvenile court did not abuse its discretion when it denied J.O.'s section 778 petition. A juvenile court may grant a section 778 petition if there is a change of circumstance or new evidence *and* it appears that the proposed change of order is in the child's best interest. (Rule 5.570(e)(1).) As the party seeking the change, it was J.O.'s burden to prove by a preponderance of the evidence that his welfare required the modification. (Rule 5.570(i)(1).) In his declaration, Chief Giraldo discussed the co-participant's "outstanding behavior" in juvenile hall and asserted that the declaration was based on Chief Giraldo's "knowledge of [A.M.]" and the case. The juvenile court reasonably concluded that Chief Giraldo's analysis of the harmful impact that the DJJ may have on co-participant A.M. was not persuasive evidence of the impact the DJJ may have on J.O. As Chief Giraldo later stated in his supplemental declaration, the declaration that he prepared on behalf of co-participant A.M. was limited to A.M.'s circumstances, and the

---

[7] In support of his section 778 petition, J.O. also attached a report prepared by the Center on Juvenile and Criminal Justice dated February 2019 that described problems with DJJ and its programming. On appeal, J.O. does not argue that this report is new evidence or changed circumstances warranting modification of the juvenile court's disposition order.

14

probation department continues to recommend placement with the DJJ depending on the circumstances and needs of each particular juvenile.

We also reject J.O.'s claim that the juvenile court's refusal to adhere to *Carlos J.* requires reversal of its denial of his section 778 petition. The decision in *Carlos J.*, *supra*, 22 Cal.App.5th 1 was not new evidence or a change of circumstance under section 778 because *Carlos J.* was decided before J.O.'s disposition hearing.

In its written ruling denying the section 778 petition, the trial court erroneously stated that it believed that it did not need to follow *Carlos J.* because *Carlos J.* was decided by another appellate district (the First Appellate District) and not this court. All appellate court decisions, however, are binding upon the superior courts of this state. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Nonetheless, the juvenile court's erroneous conclusion that it was not required to follow *Carlos J.* does not mean that it erred when it denied the section 778 petition because, as we explained in the previous section of this opinion, *Carlos J.* is distinguishable.

Accordingly, we find that that the juvenile court's denial of J.O.'s section 778 petition was not an abuse of discretion.

## C.     *Probation Conditions*

Lastly, J.O. argues that the juvenile court erred when it imposed probation conditions at the disposition hearing. The People substantially agree and concede that 23 out of the 25 probation conditions must be stricken, except for the two probation conditions that involve restitution.

We agree with J.O. and the People that the juvenile court erred by imposing probation conditions. "Commitment to DJJ deprives the juvenile court of any authority to directly supervise the juvenile's rehabilitation." (*In re Travis J.* (2013) 222 Cal.App.4th 187, 202.) We therefore strike the probation conditions imposed in this case.

We also agree that the victim restitution orders should remain. Under section 730.6, victim restitution is required in juvenile delinquency cases. Section 730.6,

15

subdivision (a)(2)(B) states in pertinent part:  "Upon a minor being found to be a person described in Section 602, . . . the court *shall order* the minor to pay . . . [¶] . . . [¶] . . . [r]estitution to the victim or victims, if any, in accordance with [section 730.6,] subdivision (h)."  (Italics added.)

On appeal, J.O. and the People characterize the victim restitution orders as probation conditions.[8]  The minute order lists them as probation condition numbers 10 and 11.  During the disposition hearing, the juvenile court imposed the victim restitution orders in the middle of imposing probation conditions.  The juvenile court, however, *also* stated that J.O. was subject to "restitution orders," signifying an intent to impose victim restitution separately.[9]  (See *People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073 [when there is a discrepancy between minute order and written pronouncement of judgment, oral pronouncement controls].)  Accordingly, since J.O. is not subject to probation conditions and since restitution is mandatory, we correct the minute order to clarify that the victim restitution orders are not probation conditions.

### III.    DISPOSITION

In case No. H047638, the juvenile court's order denying J.O.'s Welfare and Institutions Code section 778 petition is affirmed.

In case No. H047647, probation conditions numbers 1-9, 12-25 are stricken.  The minute order is modified to reflect that probation condition numbers 10 and 11 are

---

[8] In his reply brief, J.O. states that the restitution order "must be made a condition of probation," citing section 730.6, subdivision (*l*).  Section 730.6, subdivision (*l*) requires that the juvenile court impose as a condition of probation restitution fines and orders that are imposed under section 730.6.  Section 730.6, subdivision (*l*), however, does not require the juvenile court to impose restitution as a probation condition when a juvenile is not placed on probation.  Section 730.6, subdivision (a)(2) expressly states that whenever a minor is found to be a person described under section 602, the court "shall order the minor to pay" a restitution fine and victim restitution.

[9] Before the juvenile court imposed restitution, it stated:  "Also, as far as restitution, you have restitution orders.  We have a whole list of them here."

imposed as separate orders and are not conditions of probation. As modified, the disposition order is affirmed.

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:




_____
ELIA, ACTING P.J.




_____
DANNER, J.




*People v. J.O.*
**H047638**
**H047647**